**INTERNATIONAL SALT COMPANY, Plaintiff,**

v.

**GEOSTOW, a Limited Partnership, Geostock New York Holdings, Inc., Northeastern Waste Services, Inc., Bear Development Company, Inc., James Hagan, William Selden, Cynthia Selden, and William Austin Wadsworth, Defendants.**

No. Civ. 87–1501L.

United States District Court,
W.D. New York.

Oct. 12, 1988.

Kenneth A. Payment, Rochester, N.Y., for plaintiff.

Gregory Photiadis, Frank T. Gaglione, Buffalo, N.Y., Richard Vullo and Donna Katos, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

This is a diversity action brought pursuant to Article 15 of the New York Real Property Actions and Proceedings Law to quiet title. In Count 1 of its complaint, the plaintiff seeks a declaration from this court, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Article 15 of the New York Real Property and Proceedings Law, of its rights under certain deeds to the use and ownership of the mining or containing chamber created by its salt mining operation in Retsof, New York.

The only matter before the court is plaintiff's motion for summary judgment as to

Count 1 of its complaint, and for dismissal of all affirmative defenses and counterclaims raised by the defendants. Plaintiff's motion for summary judgment as to Count 1 is granted consistent with this decision.

## BACKGROUND

### A. Mining Operations

For more than one hundred years, the plaintiff, International Salt Company ("Salt Company"), and its immediate predecessor in interest, the Retsof Mining Company, have engaged in underground salt mining in and around Retsof, New York. The Retsof Mine, as it is referred to, is the world's largest underground salt mine. The present mining operation is conducted on one level only, approximately 1060 feet below the surface of the ground. The mine consists of one chamber that extends for miles in all directions.

■ The mining activities of the Salt Company and its predecessors at the Retsof Mine have historically included only "first mining", using the pillar mining method by which it horizontally extracts salt leaving large pillars of salt throughout the mine for structural support. These pillars of salt range in size from 40 to 75 feet wide and from 80 to 200 feet long and create a honeycomb effect throughout the mine. Although the parties dispute the present technological feasibility of mining these salt pillars (so-called "pillar robbing" and "pillar shaving"), there is no dispute that a substantial portion of the original salt deposit remains in these pillars. Plaintiff and defendants agree that approximately one-third of the original salt deposits at this level, or, as stated by plaintiff, approximately fifty-five million tons of salt (Affidavit of Arthur Geary, sworn to April 6, 1988 [hereafter "Geary Affidavit"]) remain in the pillars and floor and ceiling of the containing chamber.[1]

---

1. In the Statements of Disputed Material Facts submitted by the defendants, it is requested that the court, pursuant to Fed.R.Civ.P. 56(f), stay consideration of plaintiff's motion pending certain discovery, specifically, inspection of the

Retsof Mine. Defendants contend that they have insufficient information upon which to dispute certain facts set forth in Plaintiff's Statement of Undisputed Material Facts. Defendants specifically refer to the facts asserted in Para-

As the salt is removed, a containing chamber or mining cavity is created. That chamber is approximately 10 to 12 feet high (Geary Affidavit, para. 10) and is contained entirely within the salt deposit laying approximately 1060 feet below the surface. The roof and floor of the chamber are comprised of salt. • In the more recent mining excavations, the thickness of the floor and ceiling are approximately 1 to 2 feet; in older areas of excavation, the thickness is somewhat greater (Geary Affidavit, para. 13).

The Salt Company has apparently conducted only first mining and only with respect to the salt lying approximately 1060 feet below the surface of the ground. Other salt deposits appear to exist both above and below this level and have yet to be mined (Geary Affidavit, para. 5).

Active mining extraction operations occur at selected points on the perimeter of the mine. The workers enter the mine at the Fuller Shaft (Plaintiff's Exhibit F [map]), which is the mine's principal shaft. Plaintiff maintains a number of other shafts that are used for purposes of ventilation and escape. An extensive series of roadways is maintained in the mining chamber by which the workers travel back and forth to the active mining faces. The crushed salt that is extracted is transported to the Fuller shaft by means of miles of conveyor belts. Plaintiff maintains a sophisticated ventilation system, which it con-

tends utilizes all parts of the mine for airflow.

B. Conveyance of Subsurface Rights to the Salt Company

Over the years, the Salt Company, or its predecessor, has acquired by means of deed conveyances certain subsurface rights from various surface property owners, including the predecessors-in-title to the individual defendants Hugh Hagan (Hagan), William and Cynthia Selden (Seldens), and William Austin Wadsworth (Wadsworth). The extent and nature of these subsurface interests is the principal issue in this case.

The Salt Company acquired over the course of many years certain subsurface interests in the individual defendants' properties by virtue of deed conveyances to it and to its predecessor in interest from the prior owners in interest of the individual defendants.

1. Selden Property. The Salt Company, or its predecessor in interest, acquired certain subsurface rights under the Selden property by virtue of six separate conveyances, the pertinent language of which is set forth in the Appendix accompanying this Decision (Appendix, pp. 1270–73).

1. August 2, 1930 Warranty Deed from James W. Wadsworth and Alice H. Wadsworth to Retsof Mining Company (Appendix, pp. 1270–71).

2. August 2, 1930 Warranty Deed from James W. Wadsworth and Alice Wads-

graphs 10–15 of Plaintiff's Statement relating inter alia to "first minning", the existence of salt pillars, the estimated tonnage of salt remaining in the pillars and ceiling and floor of the mining chamber, the level at which mining has occurred, and the existence of salt beds above and below the present mining operation.

Defendants' request is denied. Defendants have admitted that approximately one-third of the original salt deposits remain in the Retsof Mine; that the pillars of salt exist throughout the mine (Geostow Defendants' Statement of Disputed Material Facts, # 7; Affidavit of Albert J. Gilewicz, para. 6, filed June 7, 1988; Affidavit of William Austin Wadsworth, paras. 3–4, filed June 3, 1988; Affidavit of Charles Jacoby, paras. 10–13, filed June 15, 1988); and that salt beds in addition to that being mined exist beneath the surface of defendants' properties (Geostow Defendants' Statement of Disputed Material Facts, para. 11; Affidavit of William and Cynthia Sel-

den, para. 28, filed September 21, 1988). Throughout defendants' various affidavits and memoranda and at oral argument of this motion, defendants never denied the existence of salt beneath the respective tracts of land, but contended that commercially mineable salt no longer remained in the mine.

Although a court can permit discovery if it appears from the affidavits filed that the party opposing summary judgment could not, for reasons stated, present facts essential to justify opposition to the motion, *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir.1987); *see Burlington Coat Factory Wrhse. v. Esprit De Corp.*, 769 F.2d 919, 925 (2d Cir.1985), in this case, there is no dispute as to the *material* facts. The discovery sought by defendants relates to tangential matters that are not relevant or material for purposes of resolving this case, either at this juncture or at trial.

worth to Retsof Mining Company (Appendix, pp. 1271–72.

3. May 24, 1951 Executor's Deed from James W. Wadsworth, Jr., as Executor of James W. Wadsworth, Sr. to the International Salt Company (Appendix, pp. 1271–72).

4. March 3, 1952 Executor's Deed from James W. Wadsworth, Jr., as Executor for James Wadsworth, Sr. to International Salt Company (Appendix, p. 1272).

5. June 9, 1906 Grant and Release Deed from Carrie A. Barrett to the Retsof Mining Company (Appendix, p. 1272).

6. June 9, 1906 Grant and Release Deed from Carrie A. Barrett to Retsof Mining Company (Appendix, pp. 1272–73).

Those interests not directly conveyed to the Salt Company were subsequently conveyed to it by its predecessor in interest.

2. Wadsworth Property: The Salt Company acquired its subsurface rights under the property now owned at the surface by defendant Wadsworth by virtue of a deed from Wadsworth's predecessors-in-interest, William P. and Martha S. Wadsworth, executed March 7, 1952 (Appendix, p. 1273).

3. Hagan Property: The Salt Company acquired its subsurface rights under the property now owned at the surface by defendant Hagan by virtue of three deeds in favor of the Salt Company's predecessor-in-interest, the pertinent language of which is set forth in the Appendix to this Decision (Appendix, pp. 1273–74).

1. May 19, 1905 Deed from John Slack and Anna Slack to Retsof Mining Company (Appendix, p. 1273).

2. May 19, 1905 Deed from John Slack and Anna Slack to Retsof Mining Company (Appendix, pp. 1273–74).

3. October 24, 1921 Warranty Deed from William Mann and Inez Mann to Retsof Mining Company (Appendix, pp. 1273–74).

The Retsof Mining Company subsequently conveyed its rights, title and interests under these deeds to the Salt Company.

Although each deed must be examined separately, the common focus of this case is on the meaning of the phrase "all mines, veins, seams and beds of salt". Most of the deeds contain the same, or for purposes of this discussion, equivalent, language as that contained in the granting clause in the executor's deed of March 3, 1952 from James W. Wadsworth, Jr., to the International Salt Company:

the party of the first part, ... does hereby grant and release onto the party of the second part, its successors and assigns forever, all mines, seams, veins and beds of salt and any other commercial mineral product already found, or which may hereafter be found, together with a perpetual and unrestricted right to the party of the second part, its successors and assigns to mine and remove the salt and other minerals herein conveyed by any subterranean process without liability of any kind or form to the owners of the surface....

C. Interests of Defendants

In 1987, the Geostow defendants (Geostow, Geostock New York Holdings, Inc. ["Geostock"], Northeastern Waste Services, Inc. ["Northeastern"], and Bear Development Company, Inc. ["Bear"]) announced a plan to store incinerator ash in certain portions of the Retsof Mine that they contend are mined-out. To implement this plan, the Geostow defendants sought to acquire from the surface owners their interests in the mining chamber created by the extraction of salt by the Salt Company.

In November of 1987, defendant Wadsworth gave defendant Bear a quit claim deed purporting to convey all right and title to property lying below 420 feet above sea level, excepting all mineral rights, and "subject to the rights International Salt Company may have in the premises, if any" (Plaintiff's Exhibit B to the Complaint). This conveyance of subsurface property includes that portion of the Retsof Mine located under Wadsworth's land.

On September 21, 1987, defendant Hagan entered into an option agreement with Bear Equipment & Rental, Inc., an affiliate of defendant Bear. Under the terms of this

agreement, Hagan granted Bear Equipment the exclusive option to purchase "all of the seller's right, title and interest in and to" certain real property located in the Town of York (Defendant's Exhibit B to the Affidavit of Brian F. Swartzenberg [hereafter "Swartzenberg Affidavit"]). This option agreement does not refer to any subsurface rights or rights of the plaintiff or defendant Hagan in the mining chamber, and does not allude to the proposed development by the Geostow defendants.

On or about June 26, 1987, the defendant Wadsworth, acting as agent for Bear, entered into a purchase and sale contract with the Seldens. This contact was for the purchase of the Selden Farms, including structures and personal property, and all right, title and interest in and to such property (Exhibit A to Swartzenberg Affidavit).[2]

The plaintiff claims that the interest purportedly conveyed by Wadsworth to Geostow is in conflict with its interests under prior conveyances. Hagan and the Seldens maintain that their interests give them a present right not only to the surface land, but also to the mining or containing chamber beneath their property, and it is their intent to convey the same to the Geostow defendants.[3] Defendants Hagan, Wadsworth, and Geostow interposed counterclaims for trespass based on the Salt Company's continued use of the mining chamber beneath their property.

## D. Contentions of Parties

It is the Salt Company's contention that by the conveyances to it of certain subsurface rights, the grantors intended to convey a fee simple absolute interest in the salt and, by use of the word "mines", they intended to convey the same fee interest in the containing chamber created by the extraction of the salt. Defendants do not dispute that the deeds conveyed to the Salt Company a fee simple interest in the salt, but contend that the grantors did not intend and the deeds did not create a fee simple interest in the containing chamber. Defendant's position is that ownership of the chamber reverts by operation of law to the surface owner when the Salt Company has either abandoned its interests or has

**2.** The defendant Wadsworth subsequently brought an action against the Selden defendants for specific performance with respect to this transaction. This action is pending before another judge in the Western District of New York.

**3.** Although not raised by the parties, the court has determined that this case presents an "actual controversy" within the contemplated purview of the Declaratory Judgment Act, 28 U.S.C. § 2201. The Act provides in pertinent part that

[i]n a case of actual controversy within its jurisdiction ... any Court in the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration....

The court is convinced that this case represents a controversy that is "definite and concrete, touching the legal relations of the parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). As between the plaintiff and Wadsworth and the Geostow defendants, there is a live controversy with respect to the interests purportedly conveyed by Wadsworth to Geostow. With respect to the interests of Hagan and the Seldens, none of which has been conveyed to the Geostow defendants, the court finds that there is a "substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

The Salt Company asserts in its complaint that its interests in a certain portion of the Hagan and Selden tracts is superior to that of the present owners. All the defendants deny this allegation and, except for the Seldens, seek a judgment declaring the superiority of their claims to such property. Under § 1501(5) of the New York Real Property Actions and Proceedings Law, "[t]he interest had by any mortgagee or contract vendee of real property or by any successor in interest of either of them, is an interest in real property." The Geostow defendants' interest in the Selden property, as the contract vendee, creates a protectable interest in real property under New York law. *See Gifford v. Whittemore*, 4 A.D.2d 379, 165 N.Y.S.2d 201 (3d Dept.1957). A purchase option for real property also is a sufficient interest in real property to maintain an action under § 1501. The Geostow defendants' interest in the purchase option on the Hagan property creates a protectable interest in real property under New York law. *Metropolitan Transportation Authority v. Bruken Realty Corp.*, 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379 (1986).

exhausted the commercially mineable salt. Although the issue is quite clear; the resolution of it is less so.[4]

## LEGAL DISCUSSION

### A. Summary Judgment

Pursuant to Fed.R.Civ.P. 56, summary judgment is appropriate only when a review of the entire record demonstrates that there is no genuine issue as to any material fact. *Donahue v. Windsor Locks Bd. of Fire Com'rs,* 834 F.2d 54, 57 (2d Cir.1987).

The burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986). The court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir. 1983). As such, there must not only be no genuine issue as to the material evidentiary facts, but there must also be no controversy regarding the inferences to be drawn therefrom. *Donahue,* 834 F.2d at 57; *Schwabenbauer v. Bd. of Educ.,* 667 F.2d 305, 313 (2d Cir.1981).

Once the moving party has made this showing, Rule 56(e) requires the non-moving party to go beyond the pleadings and to designate "specific facts showing that there is a genuine issue for trial." As long as the opposing party adduces sufficient facts to substantiate the elements of his claim, summary judgment is inappropriate. *Celotex,* 106 S.Ct. at 2554. Mere specula-

tion that an issue of material fact exists is not enough to defeat a Rule 56 summary judgment motion. *Knight v. U.S. Fire Insurance Company,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The role of the court on a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a *genuine* factual issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.,* at 2510 (emphasis in original).

The applicable substantive law identifies the facts that are material for purposes of summary judgment. *Id.; see, e.g., Knight,* 804 F.2d at 12. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 106 S.Ct. at 2510. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

### B. Construction of Deeds

1. "[M]ines, veins, seams and beds of salt"

■ Justice Oliver Wendell Holmes commented that, "[a] word is not a crystal,

---

4. Although not raised by the parties, the court has considered whether it would be appropriate to decline jurisdiction because this case appears to be one of first impression in New York and, in a larger context, involves a matter of some significance with respect to environmental policies in the State of New York. After careful consideration, the court has determined that neither the novelty of the case nor its public import requires the court to stay its hand.

Abstention is the exception, not the rule. *Colorado River Water Conser. Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). This is clearly not a case presenting a federal constitutional issue that might be mooted or presented in a different

posture by a state court determination of pertinent state law. *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163, 189 (1959). Although abstention is "appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar", *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244, this case does not fall within this second category of abstention. *See, id.,* at 815, 96 S.Ct. at 1245. This court's determination of the state law question will in no way be determinative of state policy or disrupt state policy. *Id.,* at 814–15, 96 S.Ct. at 1244–45.

transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content" according to the context and circumstances in which it is used. *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). In this case, the rights of the parties hinge in great part on the definition of the word "mines".

The principal issue is whether the original grantors intended to convey to the Salt Company a fee simple interest in the containing chamber created by the extraction of the salt.[5] The focus of this controversy is on the use in the deeds of the phrase "all mines, veins, seams, and beds of salt", and, in particular, on the use of the word "mines". The parties agree that this case requires the court, as a matter of law, to construe the various deeds that purport to convey to the Salt Company certain subterranean rights.

Section 240(3) of the New York Real Property Law provides that:

Every instrument creating, transferring, assigning or surrendering an estate or interest in real property must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law.

The conclusion as to the intent of the parties is a question of law for the court. *Morris v. Ward*, 36 N.Y. 587, 594 (1876); *Allen v. Cross*, 64 A.D.2d 288, 409 N.Y. S.2d 865, 868 (4th Dept.1978). It is well settled that intent must be determined as manifested by the language used in the deed. *Matzell v. Distaloa*, 105 A.D.2d 500, 481 N.Y.S.2d 453, 455 (3d Dept.1984). Every part of the deed is to be read together and its intent is to be garnered from the whole instrument. *Leader v. Leader*, 8 Misc.2d 1015, 166 N.Y.S.2d 784, 786 (Sup. Ct.Kings Co.); *see Morris*, 36 N.Y. at 596.

Where, however, the language used in a conveyance is uncertain or ambiguous—susceptible of more than one interpretation—the court will look into the surrounding circumstances and the situation of the original parties to the conveyance. *Loch Sheldrake Associates, Inc. v. Evans*, 306 N.Y. 297, 304, 118 N.E.2d 444 (1954); *Rome v. Vescio*, 58 A.D.2d 990, 397 N.Y. S.2d 267, 269 (4th Dept.1977), *rev'd on other grounds*, 45 N.Y.2d 980, 412 N.Y.S.2d 892, 385 N.E.2d 629 (1978).

Plaintiff argues that the word "mines" as used in the phrase "all mines, veins, seams and beds of salt" denotes the space or cavity in the ground created by the excavation of the salt. Defendants contend that the word "mines" is synonymous with "seams, veins and beds", and generally describes the geological formation or mode of the salt deposits.

With respect to the subsurface rights of plaintiff beneath that portion of the Selden property conveyed by the terms of the March 3, 1952 executor's deed from James W. Wadsworth, Jr. to the Salt Company, it is the court's conclusion that the deed admits of no ambiguity. This deed provided for the fee simple conveyance of "all mines, seams, veins and beds of salt and any other commercial mineral product already found, or which may hereafter be found ... together with a perpetual and unrestricted right ... to mine and remove the salt and other minerals herein conveyed...." In a subsequent paragraph it was stated that "[i]t is the intent of this instrument to convey the mineral rights under the terms and conditions of this instrument under a parcel of land bounded...." The language of this deed leaves no room for doubt: the grantor intended to convey a fee simple interest in only salt and other minerals, and not in the containing chamber. As such, the Salt Company's interest under the terms of this deed is a fee simple interest in the salt or other

**5.** Although the parties to the original conveyances undoubtedly never contemplated, much less imagined such a use of the mining chamber as that proposed by the Geostow defendants, the legal issue of ownership of the mining or containing chamber was the subject of fairly extensive litigation both before and after these conveyances. *See generally*, "Right of owner of title to or interest in minerals under one tract to use surface, or underground passages, in connection with mining other tract", 83 ALR2d 665, § 6.

mineral products only, together with the right to extract and remove them.

 However, with respect to the remaining nine deeds, the court concludes that the use of the word "mines" in the phrase "all mines, veins, seams and beds of salt" admits of some ambiguity.

There is no doubt that the commonly understood definition of "mines", standing alone, is of "a pit or excavation in the earth, from which ores, precious stones, coal, or other mineral substances are taken by digging or by any of various other mining methods." *Webster's New International Dictionary*, 2d Ed. Unabridged (1934); *see also*, 37 N.Y.Jur., Mines and Minerals, § 1. However, this is not the only definition of "mines".

In *Lindley on Mines* (3d ed. 1914), the author notes that "[the] primary significations [of mine] were soon enlarged, so that in time the word 'mine' was construed to mean, also, the place where minerals were found, and soon came to be used as an equivalent of 'vein,' 'seam,' 'lode,' or to denote an aggregation of veins, and, under certain circumstances, to include quarries and minerals obtained by open workings." *Id.*, § 89, pp. 136–37; " 'Vein,' 'seam,' 'lode', which appear to signify the same thing, viz.: a layer or stratum of material of a different nature from the stratification in which it occurs, are equivalent to the term 'mine,' when by it is understood an unopened mine." *Id.*, § 286, pp. 637–38; *see also id.*, §§ 88, 176.

Similarly, in Costigan, *Handbook on American Mining Law* (1903), the author notes the following:

> The word "mine" is a word to be avoided, because of its complex meaning. It is used so variously that it cannot be used safely without coupling with it each time a statement of the sense intended. The following are a number of meanings attached to the word:

> \* \* \* \* \* \*

(3) The word "mine" may also mean the veins or deposits of mineral, rather than the workings to get at them, or [rather] than the land in which they are found. *Id.*, § 39 (footnotes omitted).

Although the parties have not cited and the court has not discovered a reported decision construing the word "mines" as used in the deeds in question, in *Bullion, B. & C. Min. Co. v. Eureka Hill Min. Co.*, 5 Utah 3, 11 Pac. 515, 523 (1886), the Supreme Court of Utah, in discussing certain language in the Act of July 26, 1866, stated in dicta that the grant of the "mine" in question "appears to be synonymous in its meaning with the terms 'vein' or 'lode', ...". Similarly, in *Lillibridge v. Lackawanna Coal Co.*, 143 Pa. 293, 22 A. 1035 (1891), quoting from the English case *Proud v. Bates*, 34 Law.J.Ch. 406, the Pennsylvania court indicated that the word "mines" was often used to refer to the minerals rather than to the underground pit. *Id.*, 22 A. at 1038 ("Now, whether the 'mines' be used, as it often was, in the sense of minerals,—the thing dug out of the mine, or that which contain the minerals, ...").

The decisions in *Brady v. Smith*, 181 N.Y. 178, 73 N.E. 963 (1905) and *White v. Miller*, 200 N.Y. 29, 92 N.E. 1065 (1910), cited by plaintiff, provide little guidance to the court concerning the definition of "mines" in this case. In both cases, the court was called upon to construe the phrase "all mines and minerals" where a claim had been made that the word "minerals" encompassed limestone or gypsum, the former of which could be extracted only by means of an open quarry. The significance of the word "mines" in those cases was found in its conjunction with "minerals".[6] In both cases, the court concluded that the grantors, by the use of the word "mines" in conjunction with "minerals", intended to limit the word "minerals" to those "substances taken out of the bowels of the earth by the process of mining", as opposed to substances extracted by open

6. The conjunction of the words "mines and minerals" is discussed at length in *Lindley on Mines,* with citation to the *Brady* case. "The word 'mine' was used in contradistinction to 'quarry,' and 'minerals' meant substances of a mineral character which could only be worked by means of *mines,* as distinguished from quarries." *Id.,* § 68.

quarrying. *Brady*, 181 N.Y. at 185, 73 N.E. 963. The *Brady* court's use of the primary definition of the word "mine" is not dispositive of the issue posed by this case. Quite to the contrary, this court is guided by the admonition in *Brady* against "[t]he adoption of arbitrary definition[s]". *Id.* "[E]ach case must be decided upon the language of the grant or reservation, the surrounding circumstances and the intention of the grantor if it can be ascertained." *Id.*

In this case, the word "mines" is used in conjunction with the phrase "seams, veins, and beds of salt". The words are joined by "and", indicating a copulative conjunction —that is, a conjunction of complementary terms. *See Fowler's Modern English Usage* (2d Ed.1965). Plaintiff would have this court disregard the collocation of the words and rewrite the deeds to read "all mines, *and* seams, veins, and beds of salt."

Regardless of whether "mines" might have a broader meaning in some other context, it must be read and considered in relation to the other terms with which it is grouped under the familiar principle of *noscitur a sociis*. *Harris v. Allstate Ins. Co.*, 309 N.Y. 72, 76, 127 N.E.2d 816 (1955); *see National Muffler Dealers Ass'n v. United States*, 565 F.2d 845, 846 (2d Cir. 1977), *aff'd*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979); *see e.g., California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987); *General Electric Co. v. OSHA*, 583 F.2d 61, 65 (2d Cir.1978). The court is well aware that formalistic application of this rule should be avoided. *Russell Motor Car Co. v. United States*, 261

U.S. 514, 43 S.Ct. 428, 67 L.Ed. 778 (1923); *Reiche v. Smythe*, 80 U.S. (13 Wall) 162, 20 L.Ed. 566 (1872); 2A *Sutherland Statutory Construction* § 47.16 (1984). This principle suggests that the word "mines" was intended to be understood in the same general sense as veins, seams, and beds of salt—that is, descriptive of the mode in which the salt occurs, rather than denoting the excavation cavity or containing chamber. This interpretation is buttressed by reference to other language in the deeds.

In eight of the ten deeds in question, the phrase "all mines, veins, seams and beds of salt" is conjoined with "and any other mineral product [or "commercial mineral product"]".[7] Conjunction of this phrase with the preceding phrase lends further support to the construction of "mines" as a synonym of "veins, seams and beds", indicating an intent to convey salt, in whatever geological mode it might be found. In five of the ten deeds, there is express reference to salt as the subject of the conveyance: "together with a perpetual and unrestricted right to the party of the second part, ... to mine and remove the salt and other minerals *herein* conveyed...." (emphasis added).[8]

The inclusion of either or both of these phrases in all the deeds in question, together with the collocation of the words in the copulative conjunction "mines, veins, seams and beds of salt" persuades this court that the intent of each of the grantors was to convey a fee simple interest in only the salt (or other mineral product), and was not to convey a fee simple interest in the contain-

---

**7.** With respect to the Selden property, the following deeds contain such language: the May 24, 1951 conveyance from James Wadsworth, as executor, to the Salt Company, the March 3, 1952 conveyance from James Wadsworth, as executor, to the Salt Company, and the two June 9, 1906 conveyances from Barrett to the Mining Company. With respect to the Wadsworth property: the March 7, 1952 conveyance from William and Martha Wadsworth to the Salt Company. With respect to the Hagan property: the two May 19, 1905 conveyances from the Slacks to the Mining Company, and the October 24, 1921 conveyance from the Manns to the Mining Company. See Appendix.

**8.** The following deeds contain such language with respect to the Selden property: the two

August 2, 1930 conveyances from James and Alice Wadsworth to the Mining Company, and the May 24, 1951 and March 3, 1952 conveyances from James Wadsworth, as executor, to the Salt Company. With respect to the Wadsworth property, the March 7, 1952 conveyance from William and Martha Wadsworth to the Salt Company contains this language.

Although none of the deeds relating to the Hagan property contain this express language, the October 24, 1921 conveyance from the Manns to the Mining Company contains similar language: "together with the perpetual right and unrestricted privilege of mining and removing *the same...*."

ing chamber created by the extraction of the salt.

With respect to the two August 2, 1930 conveyances from James and Alice Wadsworth to the Mining Company of subsurface rights beneath the property now owned by the Seldens, there is additional support for this conclusion. Both of these warranty deeds are captioned "Grant of Mineral Rights". This caption, alone, would not lead the court to conclude that the fee estate was limited to the salt. However, when coupled with the language previously discussed, this conclusion is even more compelling with respect to these two deeds.

2. Ownership and Use of Containing Chamber as Incident of Fee Estate in Salt

■ Having concluded that the deeds did not expressly convey a fee simple estate in the containing chamber, the court must consider whether the containing chamber is necessarily a part of the fee estate in salt. To this end, the court is guided by a settled body of case law in America from the late 19th and early 20th centuries.

The first, and leading case was *Lillibridge v. Lackawanna Coal Co.*, 143 Pa. 293, 22 A. 1035 (1891) (conveyance in fee of all merchantable coal), where the plaintiff (surface owner) sought to enjoin the subsurface owner of coal from carrying coal from adjacent subsurface properties through a tunnel beneath his property. Although the Pennsylvania court did not draw a clear distinction between fee ownership of the containing chamber and the right to use such chamber, the court clearly rejected the argument that the right to use the chamber was based on the existence of an easement. *Id.*, 22 A. at 1037. The court held that where "the tunnel or way is exclusively within the defendant's property [coal], ... it is subject to such use as any owner may desire of property belonging to himself." *Id.*, 22 A. at 1039. In *Lillibridge*, as in the instant case, the tunnel or containing chamber was entirely within the mineral estate—that is, the floor and ceiling were coal. *Id.*, 22 A. at 1039.

In the subsequent case of *Webber v. Vogel*, 189 Pa. 156, 42 Atl. 4 (1899) (conveyance in fee of all merchantable coal), the Pennsylvania Supreme Court, in reaffirming its holding in *Lillibridge*, held that "while the purchaser of the coal was in good faith mining out his coal, his right to the use of the space made vacant by his workings as they progressed could not be successfully obstructed by the owner of the surface." *Id.*, 42 A. at 5. The court emphasized that the mineral owner did not acquire a perpetual right of way beneath the land of the surface owner, and that the surface owner has the "right to the reversion of the space occupied by the coal *within a time contemplated by the parties* when they sever" the mineral estate. *Id.*

In the later case of *Moore v. Indian Camp Coal Co.*, 75 Ohio St. 493, 80 N.E. 6 (1907) the court explained that the mineral owner's right to use the space or containing chamber was based on his "absolute proprietorship over the mineral in place". As a result of that ownership, he had "a like interest in the containing chamber until the termination of the [mineral] estate." *Id.*, 80 N.E. at 8. In so holding, the court also rejected the idea that the right to use the space was an incidental easement.

> The phrase "containing chamber," ... is simply a convenient expression for the limits or boundaries of the grant. The grant [of minerals] is an entirety and the estate thereby created is determinable as a whole upon the contingency of the exhaustion of the mine.... The empty space is, therefore, not merely property which may be used as an incident to the removal of the mineral included in the grant, but ... [the mineral owner] may use the space created by removal of mineral within the grant, as a way for the carriage of minerals from his adjoining lands, or, if he prefers to do so he may cut a passage through the minerals and use it for the carriage of minerals from his other lands.

*Id., citing MacSwinney on Mines.*

The decision in *Lillibridge*, as clarified in *Moore* and *Webber*, represents the well-settled majority rule in this country. The

owner in fee of the mineral estate does not therewith acquire a separate fee interest in the containing chamber created by the extraction of minerals [9], but he has the right to use such space, as he sees fit, at least until the exhaustion of the mineral estate. *Lillibridge, supra,* 22 A. at 1037–38; *Chartiers Block Coal Co. v. Mellon,* 152 Pa. 286, 25 A. 597, 599 (1893); *Webber v. Vogel, supra,* 42 A. at 5; *Westerman v. Pennsylvania Salt Mfg. Co.,* 260 Pa. 140, 103 A. 539, 540–41 (1918); *Moore v. Indian Camp Coal Co., supra,* 80 N.E. at 8 (1907); *Kormuth v. United States Steel Co.,* 379 Pa. 365, 108 A.2d 907, 909 (1954), *cert. denied,* 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246 (1955). *See also, United States v. 43.42 Acres of Land,* 520 F.Supp 1042, 1045 & n. 9 (W.D.La.1981); Stamm, "Legal Problems in the Underground Storage of Natural Gas", 36 Tex.L.Rev. 161, 168 (1957).

Although there is no reported New York case on point, the decision in *Miles v. Home Gas Co.,* 35 A.D.2d 1042, 316 N.Y.S.2d 908 (3d Dept.1970), provides some guidance. In *Miles,* the court was called upon to determine whether the subsurface owner had the right to store natural gas piped in from foreign fields in exhausted natural gas wells under the terms of a deed conveying to it "all the oil, gas and minerals in said premises, together with the right at all times to enter upon said premises and to bore wells, . . . and remove all oil, gas and minerals found thereon." Although not discussing *Lillibridge* or any of its progeny, the court appeared to follow the reasoning of those cases in holding that

> "[t]he wording of the reservation and grant [was] clear and unambiguous in conveying rights solely relating to the production and transmission of gas from the property and cannot be construed as also covering the storage activity engaged herein by appellant. While a grant of production rights will include

the right to conduct all operations necessary to extract those minerals [citation omitted], such a grant alone cannot be construed to include the right to store gas piped in from foreign fields [citation omitted]."

*Id.,* 35 A.D.2d at 1043, 316 N.Y.S.2d 908.

Although it is the court's conclusion that the original grantors intended to convey a fee simple estate in only the salt, and that the grant did not necessarily include a like interest in the containing chamber, the Salt Company has the right, at least prior to the exhaustion of the fee estate in salt beneath the respective tracts, to use the mining chamber, both for purposes of mining salt beneath that tract and beneath adjoining or other tracts.[10] *Lillibridge,* 22 A. at 1037–38; *Chartiers Block Coal Co. v. Mellon,* 152 Pa. 286, 25 A. 597, 599 (1893); *Webber,* 42 A., at 5; *Westerman v. Pennsylvania Salt Mfg. Co.,* 260 Pa. 140, 103 A. 539, 540–41 (1918); *Moore,* 75 Ohio St. 493, 80 N.E. 6; *Kormuth,* 379 Pa. 365.

As such, the final resolution of who has the present right to use the mining or containing chamber depends upon whether there is still salt beneath the surface of the respective tracts of land.

## C. Plaintiff's Right to Use Mining Cavities: Exhaustion of Estate in Salt

▇ There is no dispute that there are still substantial salt deposits in the Retsof Mine beneath each of the defendants' respective tracts of land. Plaintiff claims that nearly 55 million tons of salt remain in the pillars of salt and in the floor and ceiling of the mine, and that other salt deposits exist above and below the present mining operation throughout the mine. Defendants admit that approximately one-third of the original salt deposit remains unmined.

Based on these facts, plaintiff contends that it is entitled to summary judgment.

9. The rule in England appears to be to the contrary. *See* Stamm, "Legal Problems in the Underground Storage of Natural Gas", 36 Tex.L. Rev. 161, 168 and n. 42; *see also, Ellis v. Arkansas Louisiana Gas Co.,* 450 F.Supp 412, 421 (E.D.Okla.1978).

10. Based on the holdings in the cases cited, and the fact that the containing chamber is wholly within the salt estate, as in *Lillibridge,* there is no merit to defendants' counterclaims for trespass.

Defendants contend, however, that issues of material fact are in dispute, specifically whether "commercially mineable" salt remains beneath the land and whether the Salt Company's alleged use of the entire containing chamber is reasonable and necessary to its mining operation.

Defendants claim that the technological and commercial feasibility of so-called "pillar shaving" and "pillar robbing" presents an issue of material fact. Defendants claim that because these processes are not feasible at present, the salt in those portions of the Retsof Mine that are no longer actively mined has been exhausted and therefore the mining chamber in those areas has "reverted" [11] by operation of law to the surface owner.

At this juncture, it bears repeating that the role of the court on a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a *genuine* factual issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, 106 S.Ct. at 2510 (emphasis in original).

There is no doubt that there is a genuine dispute concerning the feasibility of certain methods of second mining and the plaintiff's use of the containing chamber in areas in which first mining has been completed. However, this court finds that these are not issues of material fact.

The facts in this case are similar to those set forth in the 1918 decision in *Westerman*, 260 Pa. 140, 103 A. 539 (1918). In that case, the mineral owner had conducted "first mining" and left substantial amounts of coal in place in the form of pillars while it finished first mining throughout the 1000 acre plot. No active first mining had occurred under plaintiff's land since 1908 (ten years before the court's decision). The court held that "[w]hile a tract that is in open workable condition is being mined, the fact that there may be a temporary suspension of operations therein will not deprive the mine owner of the right to use the driveways for transportation of other coal, where he is acting in good faith and mining in the customary manner." *Id.*, 103 A. at 540. With respect to the defendant's delay in mining the coal pillars where first mining under plaintiff's property had been completed in 1908, the court stated

> Since the balance of the coal and the right to remove it belong to the defendant, as well as the space made by first mining, the mere fact that the removal of the ribs has been temporarily deferred to facilitate the general mining operation will not defeat defendant's right to use such space for the transportation of other coal. Neither the coal nor the space revert to plaintiff because of such temporary suspension of mining. The deed gives defendant the coal, without any restriction as to the time when it shall be mined; so there is nothing upon which to base any claim of reversion.

*Id.*, 103 A. at 541.

The deeds in question here conveyed a fee simple absolute interest in salt. None of the deeds contained a provision limiting the quality of that estate, as was the case in *Lillibridge, supra,* and *Webber, supra,* where the fee estate was limited to "merchantable" coal. There is no provision in any of the deeds that limits the extent or duration of the estate. There is no provision from which it can be reasonably inferred that the grantee owed an implied

---

**11.** Although a number of the courts have used the term "revert" or "reversion", *see, Webber, supra; Westerman, supra,* such use is confusing in light of the fact that no interest in the subject of the supposed reversion (the containing chamber or space) was ever granted or conveyed in the first instance. The court's comments in *Chartiers Block Coal Co. v. Mellon,* 152 Pa. 286, 25 A. 597 (1893) are illustrative of this confusion. "When the coal is all removed, the estate ends, for the plain reason that the subject of it has been carried away. The space it occupied reverts to the grantor by operation of law. It needs no reservation in the deed because it was never granted." *Id.*

duty of speedy development to the original grantors or their successors in interest.

Quite to the contrary, six of the ten deeds contain language granting the plaintiff a "perpetual and unrestricted right" to mine by "any subterranean process".[12] It is quite clear from this language that the original parties to the conveyance did not contemplate any time limitation within which the fee estate was to be mined. *See Westerman*, 103 A. at 541. In fact, the inclusion of the latter phrase, "by any subterranean process", evidences the grantor's understanding that mining would occur *in futuro* and that plaintiff's enjoyment of its estate would not be limited to then-known methods of mining. In *Marvin v. Brewster*, 55 N.Y. 538, 551–52 (1874) the court observed that the phrase "by any subterranean process" indicated that "the exercise of [the] right [to mine was] not to be confined to the modes in vogue when it was first acquired." As such, defendants' attempts to limit the plaintiff's estate or right to mine to "mineable" salt—that is, "material that can be mined under present day mining technology and economics"—is without merit. Such a limitation is clearly inconsistent with the conveyance of a fee simple absolute estate. Furthermore, plaintiff's suspension of active mining beneath the Hagan, Selden, and portions of the Wadsworth properties, does not amount to an abandonment of their interests thereunder. "Nonuse alone, even for a long period of time, is not enough to constitute abandonment." *Banach v. Home Gas Co.*, 12 A.D.2d 373, 375, 211 N.Y.S.2d 443 (3d Dept.1961).

Based on the lack of dispute as to the presence of salt in the containing chamber beneath the defendants' respective tracts of land, and the lack of any language in the deeds limiting the quality of the estate or the duration of the plaintiff's interest therein or of its right to mine and remove the salt, it is the court's conclusion that plaintiff has the present and exclusive right to the use of the mining or containing chamber beneath defendants' properties.

## CONCLUSION

The plaintiff's motion for summary judgment with respect to Count 1 of its complaint is granted consistent with this court's decision.

ACCORDINGLY,

It is hereby DECLARED AND ORDERED that by virtue of the relevant deed conveyances (See Appendix) to the plaintiff, or its predecessor in interest, the plaintiff, International Salt Company, is the owner in fee simple absolute of all salt, and where so conveyed, other minerals, beneath the defendants' respective tracts of land;

It is further DECLARED AND ORDERED that by terms of the relevant deed conveyances (See Appendix), the plaintiff, or its predecessor in interest, did not acquire a fee simple absolute estate in the containing chamber created by the extraction of the salt;

It is further DECLARED AND ORDERED that the plaintiff, International Salt Company, has, by virtue of its fee simple estate in salt, and where so conveyed, in other minerals, the present and exclusive right to the use and enjoyment of the containing chamber created by the extraction of the salt beneath defendants' respective tracts of land;

It is further ORDERED that defendants' Counterclaims for trespass be, and hereby are dismissed.

Plaintiff is hereby directed to submit an appropriate order to the court.

SO ORDERED.

## APPENDIX

*Conveyances Relating to the Selden Property.*

1. By the terms of a Warranty Deed executed August 2, 1930 from James W.

---

12. The right to mine and remove the salt is implied where not expressly given as a necessary incident to the enjoyment of the fee estate. *See Marvin v. Brewster Iron Min. Co.*, 55 N.Y. 538, 549–50 (1874) ("It is an old rule, that, when anything is granted, all the means of attaining it, and all the fruits and effects of its are also granted."); 37 N.Y.Jur., Mines and Minerals, § 24.

Wadsworth and Alice H. Wadsworth to the Retsof Mining Company (Plaintiff's Ex. C–2), the Wadsworths, being the party of the first part, did

GRANT AND CONVEY to the said party of the second part, its successors and/or assigns forever, all mines, veins, seams and beds of salt, together with a perpetual and unrestricted right to the party of the second part, its successors and/or assigns to mine and remove the salt herein conveyed by any subterranean process without liability of any kind or formed to the owners of the surface,....

And being the same premises as shown and outlined upon a map showing mineral rights of the Retsof Mining Company to be acquired from J.W. Wadsworth, Jr., dated July 23, 1930, and filed in the Livingston County Clerk's Office August —— 1930 in Case No. ——, which shows this parcel as J.W. Wadsworth, Jr.....

It is expressly understood that it is not intended by this instrument to convey any right or interest whatsoever in or to the surface of said premises, or the right to enter thereon, or to use the same, or any part thereof.

With the appurtenances and all the estate, title and interest therein of the said parties of the first part, and the said James W. Wadsworth, Jr., party of the first part, does hereby covenant and agree to and with the said party of the second part, its successors and/or assigns that at the time of the ensealing and delivery of these presents, he is the lawful owner and is well seized in fee simple of the premises above described, free and clear from all liens or other encumbrances of every name and nature, legal or equitable, and that he has good right and full power to convey the same, and that the premises thus conveyed in the quiet and peaceable possession of the said party of the second part, its successors and/or assigns, he will forever WARRANT AND DEFEND against any person whomsoever lawfully claiming the same, or any part thereof.

2. By virtue of a Warranty Deed executed August 2, 1930 from James W.

Wadsworth, Jr. and Alice H. Wadsworth to the Retsof Mining Company (Plaintiff's Ex. C–3), the Wadsworths did

GRANT AND CONVEY to the said party of the second part, its successors and/or assigns forever, all mines, vei ns [sic], seams and beds of salt, together with a perpetual and unrestricted right to the party of the second part, its successors and/or assigns to mine and remove the salt herein conveyed by any subterranean process without any liability of any kind or form to the owners of the surface....

And being part of the premises shown and outlined on a map of the Retsof Mining Company showing the Mineral Rights to be acquired by [sic.] J.W. Wadsworth, Jr., which map is dated July 23, 1930, and filed in the Livingston County Clerk's Office August—1930, in Case No.—the parcel being marked on the said map; "J.W. Wadsworth, Jr.," ....

It is expressly understood that it is not intended by this instrument to convey any right or interest whatsoever in or to the surface of said premises, or the right to enter thereon, or to use the same, or any part thereof.

With the appurtenances and all the estate, title and interest therein of the said parties of the first part, and the said James W. Wadsworth, Jr., party of the first part, does hereby covenant and agree to and with the said party of the second part, its successors and/or assigns that at the time of the ensealing and delivery of these presents, he is the lawful owner and is well seized in fee simple of the premises above described, free and clear from all liens or other encumbrances of every name and nature, legal or equitable, and that he has good right and full power to convey the same, and that the premises thus conveyed in the quiet and peaceable possession of the said party of the second part, its successors and/or assigns, he will forever WARRANT AND DEFEND against any person whomsoever lawfully claiming the same or any part thereof.

3. By virtue of an Executor's Deed executed May 24, 1951, from James W. Wadsworth, Jr., as Executor of the Last Will and Testament of James W. Wadsworth, Sr., (Plaintiff's Ex. C–4) whereby the International Salt Company acquired the following rights.

the party of the first part, by virtue of the power and authority to him given in and by the said Last Will and Testament, and in consideration of the sum of nine hundred thirty-five dollars ($935.00), ... paid by the party of the second part, does hereby grant and release onto the party of the second part, its successors and assigns forever, all mines, seams, veins and beds of salt any [sic] any other commercial mineral product already found, or which may hereafter be found, together with a perpetual and unrestricted right to the party of the second part, its successors and assigns to mine and remove the salt and other minerals herein conveyed by any subterranean process without liability of any kind or form to the owners of the surface....

TO HAVE AND TO HOLD the herein granted premises onto the party of the second part, its successors and assigns forever.

4. By virtue of an Executor's Deed executed March 3, 1952 from James W. Wadsworth, Jr., as Executor of the Last Will and Testament of James W. Wadsworth, Sr. (Plaintiff's Ex. C–5), the International Salt Company acquired the following interests.

the party of the first part, by virtue of the power and authority to him given in and by the said Last Will and Testament, and in consideration of the sum of two thousand dollars ($2000.00) ..., paid by the party of the second part, does hereby grant and release onto the party of the second part, its successors and assigns forever, all mines, seams, veins and beds of salt and any other commercial mineral product already found, or which may hereafter be found, together with a perpetual and unrestricted right to the party of the second part, its successors and assigns to mine and remove the salt and other minerals herein conveyed by any subterranean process without liability of

any kind or form to the owners of the surface....

It is the intent of this instrument to convey the mineral rights under the terms and conditions of this instrument under a parcel of land bounded west by the River Road, north by the Town Line between the Towns of York and Leicester, east by the Genesee River and south by lands of International Salt Company which contains approximately 200 acres more or less.

TO HAVE AND TO HOLD the herein granted premises onto the party of the second part, its successors and assigns forever.

5. By virtue of a deed executed on June 9, 1906 between Carrie A. Barrett and the Retsof Mining Company (Plaintiff's Ex. C–6), the Mining Company acquired the following interests:

the said party of the first part in consideration of thirty-four Hundred dollars ($3,400.00), ... paid by the party of the second part, does hereby grant and release onto the said party of the second part, [illegible], and assigns forever, all mines, seams and beds of salt and any other commercial mineral product already found or which may be hereafter found ...;

It is hereby expressly understood that it is not intended by this deed to convey any right or interest whatsoever in or to the service of the premises[.]

6. By virtue of a deed executed June 9, 1906 (Plaintiff's Exhibit C–7), the Retsof Mining Company acquired from Carrie A. Barrett the following interests.

the said party of the first part in consideration of One thousand Eight Hundred and Ninety Dollars ($1,890.00) ($1,890.00), [sic] ..., paid by the party of the second part, does hereby grant and release unto the said party of the second part, its successors and assigns forever, all mines, veins, seams and beds of salt and any other commercial mineral product already found or which may be hereafter found....

It is hereby expressly understood that it is not intended by this deed to convey any right or interest whatsoever, in or to the surface of the premises above described.

Those interests that were not directly conveyed to the Salt Company were subsequently conveyed by deed from the Retsof Mining Company to International Salt Company (see Plaintiff's Exhibits C–8, 9, 10).

*The Wadsworth Property.* The Salt Company acquired its interests under the parcel of land presently owned by William Austin Wadsworth by virtue of a Warranty Deed executed March 7, 1952 between William P. Wadsworth and Martha S. Wadsworth and the International Salt Company (Plaintiff's Exhibit D), the relevant language of which is set forth below.

the parties of the first in consideration of the sum of One ($1.00) Dollar, and other valuable consideration, paid by the party of the second part, do hereby grant and release unto the party of the second part, its successors and assigns forever, all mines, seams, veins and beds of salt and any other commercial mineral products already found, or which may hereafter be found, together with an unrestricted perpetual right to the party of the second part, its successors and assigns, to mine and remove the salt and other minerals herein conveyed by any subterranean process without liability of any kind from the owners of the surface ...:

IT IS expressly understood and agreed that it is the intention of this instrument not to convey any right or interest whatsoever in and to the surface of said premises or the right to enter thereon, or the use of same, or any part thereof.

IT IS FURTHER mutually understood and agreed that the main consideration for this conveyance is the transfer of all mines, seams, veins, deposits and beds of salt, and it is mutually understood and agreed that if any other mineral products are found and used by the party of the second part, for commercial purposes, then and in that event ownership of same shall be in the party's of the first part and/or their distributees, and the remov-

al of same shall be subject to an additional agreement.

*The Hagan Property.* The Salt Company acquired its interests by virtue of three conveyances made to its predecessor in interest, the Retsof Mining Company.

1. By virtue of a May 19, 1905 deed from John W. Slack and Anna Slack to the Retsof Mining Company (Plaintiff's Exhibit E–1). Under the terms of that instrument, and for consideration in the amount of One Dollar, the Slacks did:

grant and convey, to the said party of the second part, its successors and assigns,

All mines, veins, seams and beds of salt and any other commercial mineral product already found or which may be hereafter found....

2. By virtue of a May 19, 1905 deed from John W. Slack and Anna Slack to the Retsof Mining Company (Plaintiff's Exhibit E–2), the Slacks, for consideration of One Dollar, did:

grant and convey, to the said party of the second part, its successors and assigns,

All mines, veins, seams and beds of salt and any other commercial mineral product already found or which may be hereafter found....

3. By virtue of a Warranty Deed executed October 24, 1921 from William Mann and Inez Mann to the Retsof Mining Company (Plaintiff's Exhibit E–3), the Manns, for consideration of One Dollar, did:

grant, release and convey to the said party of the second part, its successors and assigns, forever, all mines, veins, seams and beds of salt and any other mineral products already found or which may hereafter be found in, upon or under the following demised premises, together with the perpetual right and unrestricted privilege of mining and removing the same by any subterranean process, ...

Together with the appurtenances and all the estate, title and interests therein of the said parties of the first part. And the said William Mann, party of the first part, does hereby covenant and agree to and with the said party of the second

part, its successors and assigns, that at the time of the ensealing and delivery of these presents he is the lawful owner and is well seized, in fee simple, of the premises above described, free and clear from all lien, right of dower, or other incumbrance of every name and nature, legal or equitable and that he has good right and full power to convey the same, and that the premises thus conveyed in the quiet and peaceable possession of the said party of the second part, its successors and assigns, he will forever WARRANT AND DEFEND against any person whomsoever lawfully claiming the same or any part thereof.

The rights of the Retsof Mining Company were subsequently conveyed by it to the Salt Company.

On November 8, 1978, the defendant Hagan obtained his surface rights in his parcel by virtue of four Executor Deeds of Hugh Hagan (Plaintiff's Exhibits E–4, 5, 6, 7).