Chief Judge Breitel.
Plaintiffs, three separate owners of private homes built on filled sandy soil on the south shore of Long Island, brought separate actions, since consolidated, to recover for property damage. The damage, subsidence of their lands, was allegedly caused by a hydraulic landfilling project conducted by defendants, the Town of Hempstead, its contractor, and its design engineer, on 146 acres of swampy meadowland abutting plaintiffs’ homes.
Supreme Court, after jury trial, awarded plaintiffs Doundoulakis and D’Angelo judgment against the town, but set aside the verdicts and dismissed their complaints as against the engineer, De Bruin, and the contractor, Gahagan Dredging Corporation. With respect to the complaint of plaintiffs Silver, the verdict in their favor was set aside and their complaint dismissed in its entirety. From an order of the Appellate Division, one Justice dissenting, modifying the judgment to reinstate all of the plaintiffs’ verdicts, defendants appeal.*
The pivotal issue is whether it was established that hydraulic dredging and landfilling, that is, the introduction by pressure of a continuous flood of massive quantities of sand and water, is, under the circumstances, an abnormally dangerous activity giving rise to strict liability. Subsidiary issues involve whether strict liability should be imposed on the contractor and design engineer engaged by the offending landowner and, if so, whether apportionment of relative liability can be had among defendants. Assuming that strict liability does not attach, a dependent issue would be whether the contention that defendants conducted the landfill operation incautiously was sufficiently supported to warrant submission of the issue of negligence to the jury. Other issues turn on the application of section 50-e of the General Municipal Law governing no *446 tices of claims, and interpretation of provisions for indemnification in the town’s agreement with its contractor.
Plaintiffs’ pleadings and theory of action were based on negligence in the handling of the landfilling project. The trial court, however, precluded submission to the jury of that issue and instead submitted the case on the theory, never raised by the parties, of "absolute” liability for harm caused by activity in the nature of trespass and dangerous use of abutting or adjacent property. The Appellate Division, in modifying, in effect sustained the trial court’s preclusion of the negligence issue and submission of the case on theories of strict liability. It extended liability, however, to all of the defendants. As a consequence, plaintiffs’ claims based on negligence have never been determined by a fact finder and, indeed, were expressly rejected by the trial court.
There should be a reversal and a new trial. Although the record suggests that hydraulic dredging and landfilling is not a "normal” activity, in the special sense in which the standard has been developed, the record is unsatisfactory to establish that the activity was in this case abnormally dangerous. A new trial is needed, however, to resolve the issue of negligence, the original basis for liability urged by plaintiffs, and to which the record is largely devoted, an issue never submitted to the jury. On such retrial, plaintiffs are also entitled to establish, if they can, that there is sufficient basis for recovery on a theory of strict liability.
Plaintiffs’ homes, constructed around 1961, were part of a housing development built on filled meadowland on Long Island’s south shore. Because it was bordered on the west by a navigable stream of water, Parsonage Creek, the property was bulkheaded. Immediately south of plaintiffs’ homes, and extending eastward, were 146 acres of marshland owned by the Town of Hempstead.
The town property, on which the town proposed to lay out a public park, was significantly lower in elevation than the filled land on which plaintiffs’ homes had been constructed. Building a public park required that one and one-half million cubic yards of sandfill be deposited on the 146 acres. Defendant De Bruin was engaged by the town to prepare the plans and specifications and to act as supervising engineer on the site. Gahagan Dredging Corporation was awarded the landfilling contract.
Starting on September 5, 1966, and continuing 24 hours a *447 day, a dredged mix of 85% water and 15% sand was pumped, under pressure, onto the park site. Over two miles of pipe brought the mixture from the Jones Beach inlet. To impound the waters, dikes had been constructed around most of the landfill site. Settlement of the sand was accomplished and the level of water controlled by a system of exit weirs designed to discharge up to 40,000 gallons of water per minute.
Presumably in part because plaintiffs’ land was significantly higher in elevation than the land to be filled, no dike had been installed on the side of the landfill abutting plaintiffs’ homes. It also seems that a dike constructed along that border during the development of plaintiffs’ homes was believed still in place. In fact, however, part of that dike had been removed when a roadway was put in. And despite the system of exit weirs, a "lake” of over 50 acres in the area south of plaintiffs’ homes had accumulated as a result of the hydraulic landfill project.
On September 16, the eleventh day of the operation, the first sign of damage, a partial failure of the Doundoulakis bulkhead, was spotted. A further collapse of that bulkhead occurred five days later, the same day the D’Angelo bulkhead bowed out. Finally, in April, 1968, damage to the Silver bulkhead became manifest. Plaintiffs’ actions resulted.
Plaintiffs urge that subterranean percolation or seepage of the water from the landfill site raised the underground water table, thereby increasing the pressure and loosening the bulkhead anchorages. Defendants, on the other hand, attributed the collapse to the assertedly dilapidated and thus unstable condition of the bulkheads as well as an increase in pressure caused by heavy rainfalls.
Despite voluminous testimony on the issue of negligence, the trial court treated the hydraulic landfill project as an abnormal activity giving rise to "absolute” liability. Thus limited to the issue of proximate cause, the jury returned verdicts totaling $51,180 in favor of plaintiffs against all three defendants. For reasons not now material the trial court reduced the total verdicts by $15,007. As noted earlier, however, the verdicts against the dredging contractor and the consulting engineer were set aside so as not to extend responsibility for abnormally dangerous activities beyond offending landowners. In addition, the $6,000 verdict in favor of the Silver plaintiffs against the town was set aside for failure to serve the required notice of claim within the appointed time *448 period (see General Municipal Law, § 50-e). At the Appellate Division a majority agreed that hydraulic dredging was an abnormally hazardous activity. The judgment was modified, however, to reinstate, subject to some reductions in amount, the Doundoulakis and D’Angelo verdicts against the contractor and the engineer and the Silvers’ verdict against the town, the contractor, and the engineer.
Imposing strict liability upon landowners who undertake abnormally dangerous activities is not uncommon (see, generally, Prosser, Torts [4th ed], § 78). The policy consideration may be simply put: those who engage in activity of sufficiently high risk of harm to others, especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent (see Restatement, Torts 2d, § 519, Comment d; Spano v Perini Corp., 25 NY2d 11, 17, 18). Determining whether an activity is abnormally dangerous involves multiple factors. Analysis of no one factor is determinative. Moreover, even an activity abnormally dangerous under one set of circumstances is not necessarily abnormally dangerous for all occasions (see Restatement, Torts 2d, § 520, Comment f).
Guidelines, however, are identifiable. The many cases and authorities suggest the numerous factors to be weighed. Particularly useful are the six criteria listed in Restatement of Torts Second (§ 520): "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes”.
Thus, what should be considered in determining whether an activity is abnormally dangerous is not the most difficult part of this case. Instead, the difficulty this court has had, in contrast to the courts below, is finding enough in the record to determine how the landfill method employed by defendants measures up to the various applicable factors.
There is little if any information, for example, of the degree to which hydraulic landfilling poses a risk of damage to neighboring properties. Nor is there data on the gravity of any such danger, or the extent to which the danger can be eliminated by reasonable care. Basic to the inquiry, but not to *449 be found in the record, are the availability and relative cost, economic and otherwise, of alternative methods of landfilling. There are other Restatement factors, and perhaps still others, which the parties may develop as relevant, about which there is little or nothing in the record.
Yet, the case strongly suggests that strict liability treatment may be appropriate (cf. Sea Harbor Corp. v G & M Dredging Co., 105 NYS2d 497, 499; see, generally, Liability for Damages to Adjacent Land or Building Caused by Dredging, Ann., 62 ALR2d 526, § 4; Injury by Percolation or Seepage from Ponded Water, Ann., 38 ALR 1244). Writing for a majority of the Appellate Division, Mr. Justice Marcus G. Christ stated, succinctly and soundly, why strict liability might have been the proper standard for fixing defendants’ liability:
"From * * * review of the authorities there emerges a dominant theme, viz., that strict liability will be imposed upon those who engage in an activity which poses a great danger of invasion of the land of others. It matters little whether the force used is dynamite, gunpowder or pressure created by accumulating, massing and diverting large amounts of water by means of hydraulic pumps, pipes and impounding dikes, or whether the invasion is by objects projected by explosion, or water forced or diverted over the surface of the earth or forced underneath and through the earth. Often underlying these invasion-causing activities is a deliberate interference, distortion, wrenching or manipulation of natural forces, resources or equilibrium, frequently on a massive scale.
"At bar, the defendants transported (from a site miles from the plaintiffs’ homes), under pressure, continuously and in great quantities, waters from a site near a gate to the Atlantic Ocean, and deposited those waters virtually at the doorsteps of homes previously constructed on a filled-in meadowland. The transported water was impounded between dikes upon its arrival, and although the water was to be discharged through weirs into the bay, it was generally impounded long enough to allow the sand to settle. This operation created a Take’ of 50 to 70 acres in the immediate vicinity of the plaintiffs’ homes. Not surprisingly, the water percolated into the adjoining properties. The operations here were a far cry from the type of incidental changes of grade for which the defendant was held not liable in Kossoff v Rathgeb-Walsh (3 NY2d 583). There the defendant did not import the problem-causing 'diffused surface water’ to his property site; nor did he use leader *450 pipes, drains or ditches, much less hydraulic pumps and an impounding dike system” (51 AD2d 302, 312-313).
It is not insignificant that alternative methods, perhaps more time-consuming and expensive but less dangerous, might have been available to defendants to accomplish the landfill. It may be significant that the edges of the south shore of Long Island are much like sandbars risen from the sea with the instability appropriate to that kind of land.
That the flood of water under pressure was not treated as abnormally dangerous in McLoone Metal Graphics v Robers Dredge, (58 Wis 2d 704, 711) is not too persuasive. The Wisconsin court expressly stated that it dealt not with the adjoining landowner, but, for what relevance that may have, with the construction firm alone (id., p 709). And, the corporate plaintiff there was not the owner of a small private home, but of a building "made of concrete block” (58 Wis 2d, p 706).
On the question of causation the testimony is voluminous. And to the issue of negligence, the theory on which plaintiffs tried the case, a great part of the record, as previously observed, was devoted. But on whether hydraulic dredging and landfilling should or may give rise to strict liability, as held by both courts below, there is little supporting evidence because, again, it was not the initial issue posed by the litigants. As indicated, a new trial is needed, in any event, so that the issue of negligence may be submitted to the jury. The parties, if they be so advised, should also have the opportunity on the new trial to offer proof and argument, guided by the appropriate criteria, whether the type of landfill operation in the circumstances was abnormally dangerous. The issue had been raised by the trial court, and not improperly. The appellate litigation has been devoted to it, and its resolution is essential to a just result in the case dependent on how the negligence issue is eventually resolved.
Should it appear on a new trial that, as a matter of law, a prima facie case for strict liability has been made out, the issue who besides the offending landowner may be liable must be resolved. As the Appellate Division noted, responsibility for abnormally dangerous activities is not attributable to landowners alone. In Spano v Perini Corp. (25 NY2d 11, supra), for instance, it was the blasting contractors engaged by the City of New York who were held responsible for injuring neighboring property. Similarly, the central roles of De Bruin, planner of the dredging project, and Gahagan, the contractor, justify *451 imposition of strict liability because they were the actors through whose conduct harm was allegedly suffered by plaintiffs (see Restatement, Torts 2d, §§ 383, 384, 427A, Comment a; see, generally, 41 Am Jur 2d, Independent Contractors, § 48). Just as the landowner is responsible because for his own benefit he has chosen to engage in an activity of sufficiently high risk of harm to others, so, too, those who intentionally undertake or join in that abnormally dangerous activity must bear the consequences resulting from harm to others (but see McLoone Metal Graphics v Robers Dredge, 58 Wis 2d 704, 709-711, supra).
Also the cause of controversy below, and potentially an issue on a new trial, is whether joint actors strictly liable for abnormally dangerous activities may cross-claim for apportionment of relative culpability. Extended discussion is not needed. Since adoption of the new CPLR article 14 (L 1974, ch 742), equitable apportionment of damages may be claimed among "persons who are subject to liability for damages for the same * * * injury to property” (CPLR 1401). Nowhere is it required that the liability be predicated upon negligence (see Twentieth Ann Report of NY Judicial Conference, 1975, p 215; 2A Weinstein-Korn-Miller, NY Civ Prac, par 1401.13; McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 1401:3, p 362; see, also, Hughes v Ataka Amer., 48 AD2d 808; Noble v Deseo Shoe Corp., 41 AD2d 908, 909-910). In short, should the dredging operation be found abnormally dangerous, the cross claims of the codefendants stand.
No cause of action in strict liability having been proved, under normal circumstances the judgment in plaintiffs’ favor should have been reversed, and the matter ended. But plaintiffs, who pressed the issue of negligence throughout the trial, may not be deprived of their day in court on that issue because of the trial court’s conclusion that responsibility could be predicated on strict liability. This is true, of course, only if it is concluded that plaintiffs presented at least a prima facie case of negligence, and it is so concluded.
It is not for this court to weigh the conflicting evidence adduced by the parties. It is enough that in a record of more than 2,300 pages plaintiffs have presented some credible evidence of negligence, although the trial court thought otherwise (see 4 Weinstein-Korn-Miller, NY Civ Prac, par 4401.15, at p 44-15). There was proof, for example, that an insufficient *452 number of exit weirs were installed. Moreover, the failure to build an impounding dike abutting plaintiffs’ property, or at least to verify that the old dike was still in place, was criticized as well. Upon a new trial, these issues of fact would have to be resolved if plaintiffs are to prevail on the theory of negligence.
Two additional points merit attention. The first concerns plaintiff Silvers’ failure to comply with the 90-day notice of claim requirement of section 50-e of the General Municipal Law. In September, 1966, shortly after the initial failure of the Doundoulakis bulkhead, but before the Silvers noticed any damage, the Silvers wrote defendant town that they would hold it accountable for any settlement of their property. An investigation by the town followed. It was not until April, 1968, however, after the landfill operation had been completed, that the first sign of damage to the Silver bulkheads appeared. At that point, another seven months went by until, on November 22, 1968, formal notice of claim was served on the town.
The Appellate Division incorrectly reinstated the Silver complaint against the town. The September, 1966 letter, sent some 18 months before damage to the Silver property became manifest and hence before any cause of action accrued, did not, nor could it, purport to meet the formal requirements of section 50-e. It is true that some courts have been lenient where a municipality has affirmatively created a hazardous condition (see, e.g., Muszynski v City of Buffalo, 33 AD2d 648, affd 29 NY2d 810; Lytwyn v Town of Wawarsing, 43 AD2d 618). But the requirement that formal notice be served within 90 days after a claim arises was not involved in those cases; at issue, instead, was a requirement that as a condition precedent to liability the municipality must have had notice of the defective condition (compare General Municipal Law, § 50-i, subd 1; § 50-e, subd 1, with e.g., Town Law, § 65-a, and General Municipal Law, § 50-e, subd 4). The town, perhaps confident that any defect in the landfill operation had been corrected after failure of the Doundoulakis and D’Angelo bulkheads in 1966, was entitled by statute to prompt notice of the Silver bulkhead collapse and the consequential harm while the claim was still fresh.
The disposition of the Silver complaint against the town does not affect it with respect to the contractor and the engineer. Should a claim for apportionment later arise, fur *453 ther problems will be entailed (see Twentieth Ann Report of NY Judicial Conference, 1975, p 217; Claim Against Municipality—Notice, Ann., 93 ALR2d 1385).
With respect to the town’s cross claim for contractual indemnity from defendant contractor, the relevant clauses are set forth in full in the opinion at the Appellate Division. The many alternative hypotheses as to what the proof on retrial may reveal, however, make further comment on the applicability of the indemnification provisions too speculative at this point. To be considered in ascertaining Gahagan’s liability for "loss or damage arising out of the nature of the work” would be, for example, whether in fact strict liability is involved. Also potentially significant is whether the system of operation designed by the engineer is found by the jury to have been foreseeably faulty. In short, the present record does not permit of appellate determination of how these issues should be resolved.
The parties raise various other issues which would be easily avoided upon a new trial by preparation in light of the contentions raised. It would be bootless to consider them in view of the turn the litigation now takes. They are therefore neither considered nor discussed. Moreover, the length of this discussion should not be protracted further.
Absent defendants having engaged intentionally in an abnormally dangerous activity or being negligent in the performance of the hydraulic landfill project, they may not be cast in damages. So, too, they may not be cast in damages if the dangerous activity or their negligence, as the case may be, was not the legal cause of the harm suffered by plaintiffs. Even in strict liability, as well as in negligence, defendants’ activity must have been the proximate cause of the harm suffered. Thus harm may have been caused through no fault of defendants, through no one’s fault, or because plaintiffs’ bulkheads were quite inadequate (unknown and perhaps unknowable to defendants) or negligently maintained.
With respect to strict liability it is not every dangerous activity which will establish liability. It is only when, under the circumstances, an activity is abnormally dangerous that the actors become legally responsible. But, as developed above, the parties never adequately explored the factors which would permit a proper determination of the nature of the activity. As for the negligence theory, plaintiffs never had their day in court. Consequently, although the futility of the effort and *454 cost of the litigation thus far is regrettable, there is no judicial recourse except to require a new trial.
Accordingly, the order of the Appellate Division should be reversed, with costs to plaintiffs to abide the event, the Silver complaint against the town dismissed, and a new trial ordered with respect to all other claims and cross claims.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, etc.

 Also relevant to this appeal are various cross claims asserted among the codefendants. Those for apportionment of liability were dismissed by the Supreme Court, but reinstated at the Appellate Division. The contractor and the consulting engineer appeal. As to the cross claim brought by the town against the contractor for contractual indemnity, the town appeals from the Appellate Division’s affirmance of the Supreme Court’s dismissal.