**INTEGRATED WASTE SERVICES, INC. and Bear Development Company, Inc., Plaintiffs,**

v.

**AKZO NOBEL SALT, INC., f/k/a Akzo Salt, Inc., Defendant.**

No. 95–CV–6247L.

United States District Court, W.D. New York.

April 16, 1996.

Stephen F. Szymoniak, Donald G. McGrath, Falk & Siemer, Buffalo, NY, for plaintiffs.

Kenneth A. Payment, Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

This is a diversity action brought by Integrated Waste Services, Inc. ("IWS") and Bear Development Company, Inc. ("Bear") against Akzo Nobel Salt, Inc. ("Akzo"). Plaintiffs assert claims for negligence, strict liability for conducting an abnormally dangerous activity, nuisance, and trespass, all in connection with certain salt-mining activities undertaken by Akzo. Akzo has moved for summary judgment.

## BACKGROUND

The parties in the instant case were also parties, or are the successors to parties, in a prior case before this court, *International Salt Co. v. Geostow*, 87–CV–1501L. Akzo, which was then known as International Salt

Company,[1] sought a declaration of its rights under certain deeds to the use and ownership of the mining or containing chamber created by its salt mining operation in Retsof, New York. The defendants in that case included surface owners and other parties who had acquired the surface owners' purported possessory interests in the chambers, which the latter parties planned to use to store incinerator ash.

In a Decision and Order entered on October 12, 1988, I granted partial summary judgment in favor of Akzo, and held that it was the owner in fee simple of all salt in the mine and that it presently had the exclusive right to use and enjoy the chamber created by the mining operations. *International Salt Co. v. Geostow*, 697 F.Supp. 1258, 1270 (W.D.N.Y.1988). I also held, however, that Akzo did not have a fee simple absolute estate in the containing chamber created by the extraction of salt. *Id.* On cross-appeals by both sides, the Second Circuit affirmed. *International Salt Co. v. Geostow*, 878 F.2d 570 (2d Cir.1989).[2]

Although the issue of the surface owners' rights was not squarely presented in *International Salt*, both my decision and that of the Court of Appeals indicated that the right to possession of the mining chambers would revert to the surface owners when the salt in the mine was completely exhausted, or when Akzo abandoned the mine. *See* 697 F.Supp. at 1298; 878 F.2d at 576.

On March 1, 1992, Bear (which had been one of the defendants in *International Salt*), along with IWS, which is an affiliate of Bear, and several other parties entered into an agreement with Akzo ("the Agreement"). Bear and the other parties ("the sellers") had previously purchased some of the surface owners' rights in the mining chambers. Although Akzo had a present possessory interest in the chambers, then, the sellers owned interests in the chambers that would become possessory upon the exhaustion or abandonment of the mine.

---

1. For the sake of convenience, International Salt Co. will be referred to as Akzo in this Decision and Order.

2. Although the summary judgment motion and my decision in *International Salt* dealt only with one of several of the plaintiff's causes of action, the decision effectively ended the case, and it was subsequently dismissed.

The Agreement concerned a plan to use the mining chambers for commercial ash disposal. The nature of Akzo's and the sellers' respective interests in the mining chambers required some kind of joint undertaking between them for this project. Neither Akzo nor the sellers could store ash in the cavities without obtaining the other's consent or by acquiring the other's rights. Akzo could not store ash on its own because its possessory right was only for the purpose of mining salt, not for other operations. The sellers could not store ash in the cavities because they had no present right of possession at all.

Under the Agreement, Akzo received an option to buy the seller's interests in the property for use in an ash-disposal project. In exchange for the option, Akzo agreed to make mortgage payments on the property until the closing date of the purchase, or, if the purchase was not consummated, until the Agreement expired or was terminated. If Akzo exercised its option and the project went forward, Akzo agreed to pay IWS royalties once ash disposal began.

In March 1994, a portion of the mine collapsed, and water began entering the mine, eventually at the rate of millions of gallons per day. Although mining has continued in other parts of the mine, eventually the entire mine will fill with water and become unusable.

When the mine collapsed, therefore, the plans for the ash-disposal project collapsed as well. Accordingly, on February 27, 1995, Akzo terminated the Agreement.

There does not appear to be any dispute that Akzo had an absolute contractual right to terminate the Agreement. The Agreement set certain conditions for the setting of a closing date. See Agreement (Def.Ex. B) §§ 10.09, 10.10. As of the closing, the sellers' obligation to sell their interests, and Akzo's obligation to buy those interests, would take effect. Id. The closing date could not be set, however, until Akzo notified an escrow agent that it had "elected to proceed to the Closing ..." Agreement § 9.03(b). Akzo was not required to proceed to the closing at any time, however.

Several other parts of the Agreement make clear the very limited nature of Akzo's obligations. Most notably, § 11.01 stated that "[p]rior to the Closing Date the Purchaser [Akzo] may terminate this Agreement for any reason by delivering to Sellers and the Escrow Agent a written notice signed by a duly authorized officer of Purchaser that Purchaser has elected to terminate this Agreement." The Agreement would also terminate automatically after five years if Akzo notified the sellers that it did not want to renew the Agreement. Agreement § 11.02. If termination occurred for either reason, § 11.04 provided that "the parties shall be relieved of all obligations hereunder except as set forth expressly herein."

In addition, Akzo's obligation to make royalty payments was conditioned upon Akzo's commencement of operations of the storage facility, which was left to Akzo's "sole discretion and without obligation ..." to do so. Agreement § 3.01. Similarly, Akzo had no obligation to exercise its option to purchase the sellers' rights unless it commenced operation of the facility before termination of the Agreement. Agreement § 3.01(d).

The Agreement further stated that Akzo would not bear the risk of loss to the property by reason of any casualty in the event that it did not take title to the property, and "that nothing in this Agreement shall impose any obligation on Purchaser to repair or restore the Property or the Option Property or otherwise remedy such a loss." Agreement § 8.01.

Akzo's termination of the Agreement, then, was clearly permitted by the terms of the Agreement, and plaintiffs do not assert any claims for breach of contract. Instead, Bear and IWS allege that Akzo is liable to them for damages on theories of negligence, strict liability based on conducting an abnormally dangerous activity, nuisance, and trespass. The gist of their claims is that Akzo caused plaintiffs to lose their "cavity rights" and profits from the ash-disposal project, and that Akzo damaged surface property owned by Bear.

Akzo moves for summary judgment, principally on two grounds: (1) Akzo had no duty to preserve the mine cavities for plaintiffs'

use; and (2) plaintiffs' claimed damages are too speculative.

## DISCUSSION

### I. Akzo's Alleged Duty to Preserve the Cavities

█ In *International Salt*, both this court and the Court of Appeals noted that the original grant to Akzo gave it a right to mine "by any subterranean process," which implicitly encompassed processes that, for technological reasons, might not become available until some time in the future. *See* 697 F.Supp. at 1270; 878 F.2d at 576. Akzo asserts that in accordance with that right, it could have used a method of mining that would have destroyed the cavities. For example, Akzo states, it could have employed "solution mining," in which the salt is dissolved with water and flushed out of the cavities. According to Akzo, the flushed-out water is then evaporated to recover the salt, but the cavities remain filled with water. Since Akzo could rightfully have destroyed the cavities in such a manner, Akzo argues, it could not have had a duty to preserve the cavities for future use by defendants.

Plaintiffs dispute this argument on several grounds. First, they assert that destruction of the cavities would cause surface damage, which Akzo admits it had no right to do. Second, plaintiffs contend that *International Salt's* references to the right to mine by "any" methods simply meant that Akzo could retain possession of the cavities as long as there were possible present or future methods to extract the salt, not that Akzo could destroy the mining chambers.

Plaintiffs also maintain that under *International Salt*, they had a property interest in the cavity, even if they could not yet enjoy that interest. They argue that Akzo therefore had a duty of care not to destroy the areas in which plaintiffs had a future interest. Plaintiffs contend that there are factual issues concerning whether Akzo breached that duty through its negligent mining methods.

After reviewing the applicable case authority and considering both sides' contentions, I find that Akzo had no duty to maintain or preserve usable subterranean chambers. Plaintiffs' claims therefore fail.

The original grantors conveyed a fee simple absolute interest in salt. *International Salt*, 697 F.Supp. at 1269. They did not convey a fee interest in the space containing the salt, although Akzo's interest in the salt was accompanied by a present and exclusive right of use and enjoyment of that space for mining purposes. *Id.* at 1270.

When the salt was exhausted, then, or when Akzo abandoned the mine, Akzo's interest would simply terminate. As I noted in *International Salt*, strictly speaking the containing chambers would not "revert" to the surface owners because ownership of the chambers was never conveyed to Akzo. *Id.* at 1269 n. 11.

As the facts now exist, Akzo concedes that the salt in the water-filled chambers is for all intents and purposes unminable and that once the entire mine is flooded, the chambers will be sealed. At that point, Akzo will have abandoned the mines in question and the possessory rights to the mining chambers will pass to plaintiffs.

While plaintiffs may have a right to possession of the chambers, however, there is no basis upon which to conclude that they have a right to have those chambers in any particular condition, empty or otherwise. Plaintiffs refer frequently to their so-called "cavity rights," but there is no evidence that the original grantors ever bargained for a right to a "cavity" as such, or that Akzo's predecessor ever agreed to leave an empty chamber behind when the salt was exhausted. The right of possession of the area that formerly contained the salt would return to the surface owner upon exhaustion or abandonment of the mine, but there was no agreement concerning whether that area would contain air, water, or anything else.

For that matter, there is no evidence that the original grantors bargained for *any* "chambers" as such. If, for example, through natural processes of compression, the chambers "squeezed down" to the point where they became unusable or ceased to exist, the grantors' successors would simply take possession of the area where the cham-

bers had once been. Certainly, then, there is nothing in the record to suggest that the grantors contemplated that they or their successors would be able one day to use the chambers for their own commercial purposes.

Plaintiffs' contention that Akzo had a duty not to destroy plaintiffs' interest therefore misses the point. Plaintiffs have pointed to nothing that would support a finding that the deeds gave plaintiffs an interest in possessing empty, usable cavities. Had the original grantors desired, they could easily have insisted that the deeds contain a clause imposing a duty on Akzo's predecessor to maintain the chambers in a certain condition. In the absence of such a clause, there is no basis to infer such intent on the part of the original parties to the deeds.

■ Plaintiffs contend that the only reason they acquired the surface owners' interests was that there were existing cavities, which plaintiffs believed were commercially valuable for disposal. Plaintiffs' mere expectations, however, are insufficient to impose a duty on Akzo beyond that imposed under the original deeds. In the absence of a duty owed to plaintiffs, defendant cannot be held liable for negligence. *Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 528, 478 N.Y.S.2d 838, 467 N.E.2d 502 (1984); *Ellis v. Peter*, 211 A.D.2d 353, 355, 627 N.Y.S.2d 707 (2d Dep't), *leave to app. dismissed*, 86 N.Y.2d 885, 635 N.Y.S.2d 950, 659 N.E.2d 773 (1995).

■ Akzo also maintains that it could lawfully have destroyed the cavities or rendered them useless through mining methods such as solution mining, which would leave the cavities filled with water. Though plaintiffs dispute that this method leaves the cavities permanently flooded, it is nevertheless true that the original grantors gave Akzo's predecessor the right to employ any mining methods, including methods that were not yet known or feasible at the time the deeds were executed. *See International Salt*, 878 F.2d at 576 ("the phrase 'by any subterranean process' indicates that the right to mine was 'not to be confined to the modes in vogue when it was first acquired' ") (quoting *Mar-*

*vin v. Brewster Iron Mining Co.*, 55 N.Y. 538, 551–52 (1874)). Regardless of whether solution mining would leave the cavities flooded, then, there was never any assurance that Akzo would not someday mine by methods that would be destructive of the mining chambers. The grantors had no legitimate expectation, therefore, that future mining methods would necessarily leave the mining chambers intact and usable. Absent such an expectation, there is no basis upon which to impose a duty on Akzo to maintain the chambers in any particular condition.

■ It is true that Akzo had a duty to mine in such a way as not to cause *surface* damage or damage to subjacent property. *See, e.g., Republic Steel Corp. v. Stracner*, 246 Ala. 620, 622, 21 So.2d 690 (1945); 3 American Law of Mining § 82.08[1] at 82–29 (2d ed. 1987). Akzo concedes as much, and states that it will pay for any adequately substantiated surface-damage claim presented to it. Simply because a mine collapse may cause damage to the surface, however, does not mean that the destruction of the chambers is an injury for which Akzo should be made to answer in damages, absent some evidence of such intent on the part of the original parties to the deeds.[3] The resulting surface damage, if any, is a separate matter that does not affect plaintiffs' claim concerning their alleged "cavity rights."

## II. Proof of Damages

■ I also find that plaintiffs' claims fail for insufficient proof of damages. Even if the collapse had not occurred, there is little evidence that the disposal project ever would or could have gone forward or that plaintiffs would have realized any profits from the enterprise.

As stated earlier, Akzo never committed itself to going forward with the ash-disposal project. Akzo purchased an *option* to buy plaintiffs' rights, but it was under no obligation to exercise that option. Plaintiffs do not dispute this.

The consummation of the deal between Akzo and plaintiffs was also dependent upon

---

**3.** Although Akzo denies that it is responsible for the mine collapse, that is a disputed issue of fact that must be resolved in plaintiffs' favor for purposes of this motion.

so many contingencies that it would be purely speculative to find that plaintiffs suffered any measurable damages. For one thing, Akzo could have decided at any point that it did not want to purchase plaintiffs' interests after all, and terminated the agreement. The fact that Akzo was investigating the feasibility and desirability of going ahead with the project sheds little if any light on what Akzo's ultimate decision would have been had it not been for the collapse.

There are a number of reasons why Akzo might have decided to terminate the Agreement even in the absence of the collapse. Akzo may have decided that it wanted to continue to use the chambers for mining purposes. Even if the salt in some areas of the mine had been exhausted, Akzo might have wanted to continue to use the chambers for transportation to and from other areas where active mining was continuing, which Akzo would have had the right to do. *See Westerman v. Pennsylvania Salt Mfg. Co.,* 260 Pa. 140, 146, 103 A. 539 (1918). Since it is not disputed that there is still a considerable quantity of salt remaining in the mine, this mining could potentially have continued *for decades or even centuries.*

Akzo might also have concluded that the disposal project was not feasible for technical, economic, or other reasons. Likewise, the relevant New York State authorities, such as the Department of Environmental Conservation ("DEC"), might not have given the project the necessary permits to proceed. The fact that the mine collapsed suggests that, even if it had not collapsed, the authorities might have concluded that the danger of collapse was too great to grant permission for the project. Paul J. D'Amato, Esq., a Regional Attorney for the DEC, states in an affidavit submitted by defendant that "[g]iven the many permits needed by the project and the numerous technical, administrative, and legal issues that were never addressed [in the very limited preliminary review of the project that had taken place by the time of the collapse], it would be impossible for me to express any opinion as to the probability that all necessary permits would have been obtained or that an ash project would have been approved by DEC or commenced."

The state might also have conditionally approved the project, but the conditions imposed might have made the project prohibitively expensive. Opposition from local residents—possibly even a lawsuit to block the project—might also have persuaded or forced Akzo to give up on the project. While plaintiffs contend that these are merely issues of fact, the evidence is simply too sparse, and the contingencies too remote, to allow any reliable resolution of these issues. So many inferences would have to be drawn, upon so little evidence, that a damage award would be based on pure speculation.

In addition, the damages claimed here are based on the alleged lost profits from the royalty payments that Akzo would have made to plaintiffs had the Agreement gone ahead and the ash-disposal project begun. Because the project had not begun at the time the Agreement was terminated, however, any calculation of damages based on lost royalty payments would be entirely speculative. "[E]ven where damages are appropriate, anticipated profits will not be awarded unless a reasonable means of calculating the amount is provided. In order to recover lost profits, a business must have been established and in operation for a definite period of time and calculations based on other similar businesses are too speculative and will not satisfy the reasonable means of calculating damages and lost profit." *Mehta v. New York City Dep't of Consumer Affairs,* 162 A.D.2d 236, 237, 556 N.Y.S.2d 601 (1st Dep't 1990) (citations omitted).

When a business exists, but has not been operating long enough to have a useful record of past profits, it is difficult to establish damages with sufficient certainty to justify an award for future lost profits; *see, e.g., RMLS Metals, Inc. v. IBM Corp.,* 874 F.Supp. 74 (S.D.N.Y.1995); *International Minerals and Resources, Inc. v. Pappas,* 761 F.Supp. 1068 (S.D.N.Y.1991); *Kenford Co. v. Erie County,* 67 N.Y.2d 257, 493 N.E.2d 234 (1986); *PIA Investments, Ltd. v. UBS Securities, Inc.,* 211 A.D.2d 599, 622 N.Y.S.2d 239 (1st Dep't), *aff'd,* 86 N.Y.2d 812, 634 N.Y.S.2d 432, 658 N.E.2d 209 (1995); *676 R.S.D. Inc. v. Scandia Realty,* 195 A.D.2d 387, 600 N.Y.S.2d 678 (1st Dep't 1993). Where, as

here, the business never came into existence at all—and indeed, there was never any assurance that it would, even if the mine had not collapsed—any award of damages would be that much more speculative. Even if the project had gone ahead, it could have been years before disposal operations actually began, and there is little way to know what market conditions would have been at that time or what sort of profits might have been generated.

At oral argument, plaintiffs' counsel stated that plaintiffs are not suing specifically for lost profits, but that the alleged lost profits are simply evidence of what the value of the property would have been had the mine not collapsed. Transcript at 27. The fact remains, however, · that the damage claim is premised on the allegation that the ash-disposal project would have gone forward, and that plaintiffs would have collected royalties. Without more substantial, reliable proof concerning the royalties, then, there is simply no sound basis for any claims concerning the value of the property.

■ Another flaw in plaintiffs' case is that plaintiffs' reversionary interest was essentially worthless to anyone but Akzo. Plaintiffs' arguments are premised on their contention that absent the mine collapse, the ash-disposal project would have gone forward and generated profits. Because Akzo had the present possessory rights to the mining cavities, however, Akzo was the only party who had any interest in purchasing plaintiffs' ownership interests. Plaintiffs' claim, then, is really an assertion that Akzo's negligence destroyed the value of plaintiffs' interests to *Akzo*. Plaintiffs thereby seek to impose a duty on Akzo to keep its own option to purchase plaintiffs' interests valuable to Akzo. This, however, is essentially an attempt to require Akzo to go forward with the project, which the Agreement itself expressly did *not* require. Plaintiffs cannot add, through tort law, what amounts to a contractual duty beyond those duties imposed by the Agreement. Akzo had an absolute right to terminate the Agreement at any time, and the Agreement specifically provided that Akzo would have no duty "to repair or restore the Property or the Option Property" if

any casualty occurred prior to Akzo's taking title to the property. *See* Agreement § 8.01. The fact that Akzo's alleged negligence may have led Akzo to exercise its absolute right to terminate the Agreement, then, does not alter the facts that Akzo had that right, and that plaintiffs had no right under the Agreement to require Akzo to purchase their interests.

It should also be noted that even if Akzo had exercised its option to acquire plaintiffs' interests, Akzo would have had no further obligations under the Agreement to do anything. There was no promise on Akzo's part to proceed with the ash-disposal project, so again any finding concerning plaintiffs' lost royalty payments would be entirely speculative.

■ For all these reasons, then, plaintiffs' evidence falls far short of the standard for awarding damages under New York law, which requires that damages for lost profits be capable of being proven with "reasonable certainty." *Merlite Indus., Inc. v. Valassis Inserts, Inc.,* 12 F.3d 373 (2d Cir.1993); *Ashland Mgmt., Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993). The claimed damages in the case at bar are not capable of proof with anything even approaching certainty.

Plaintiffs rely upon several cases involving eminent domain and condemnation for the principle that damages can be measured by considering the highest and best use for a piece of property. In the context of those types of cases, that is generally true. The problem here is that the case at bar is not analogous to condemnation or eminent domain cases. Those types of cases involve takings of property that a party presently owns. No such occurrence happened here. Akzo did not "take" anything from plaintiffs. Upon permanent abandonment of the mine by Akzo, plaintiffs will take possession of the land in question. The fact that its value at the time that plaintiffs take possession may not be as high as plaintiffs had hoped does not mean that plaintiffs are entitled to or can prove damages based on what use might have been made of the property if the mine had not collapsed. For the reasons already stated, Akzo had no duty to see to it that

when Akzo relinquished possession of the property, the property would have a particular value or be suitable for a particular use.

## III. Plaintiffs' Other Claims

In addition to their negligence claim, plaintiffs also assert claims for strict liability for conducting an abnormally dangerous activity, nuisance, and trespass.

New York law imposes strict liability on landowners for damage caused from their conduct of activities that are "abnormally dangerous" or "ultrahazardous." *Doundoulakis v. Town of Hempstead,* 42 N.Y.2d 440, 448, 398 N.Y.S.2d 401, 368 N.E.2d 24 (1977). Whether an activity falls within this category is an issue for the court to decide. *Kowalski v. Goodyear Tire and Rubber Co.,* 841 F.Supp. 104, 108 (W.D.N.Y. 1994).

The New York Court of Appeals has identified several factors that are indicative of an abnormally dangerous activity: the existence of a high degree of risk of harm to others; the likelihood that the resulting harm will be great; the inability to eliminate the risk by the exercise of reasonable care; the uncommon nature of the activity; the inappropriateness of the activity to the place where it is carried on; and the extent to which its value to the community is outweighed by its dangerous attributes. *Doundoulakis,* 42 N.Y.2d at 448, 398 N.Y.S.2d 401, 368 N.E.2d 24. No one of these factors is decisive, and their relative importance will depend on the particular facts of the case. *Id.*

Plaintiffs contend that Akzo's use of "pillar robbing," *i.e.,* removing salt from the pillars supporting the roof of the mine, was an ultrahazardous activity that renders Akzo strictly liable for damages caused by the collapse, which plaintiffs contend resulted from the weakening of the pillars. On the evidence presented, however, I find as a matter of law that Akzo's mining methods, even if they did cause the collapse, were not abnormally dangerous for purposes of strict liability.

The chief difficulty with this claim is that according to plaintiffs, it was Akzo's *negli-gent* use of pillar mining that led to the collapse. In other words, plaintiffs' proof does not indicate that the risk of collapse could not have been eliminated through the exercise of reasonable care, *e.g.* by ceasing the pillar robbing before the pillars become too weak or by putting other supports in place to keep the mine from collapsing. While I recognize that this claim is an alternative to plaintiff's negligence claim, the fact remains that plaintiffs' allegations and evidence do not indicate that this method of mining is so inherently dangerous that the risks associated with it are unavoidable. *See German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 570 (S.D.N.Y.1995) (because plaintiffs implicitly admitted that risk of damage from defendants' activity could be controlled with reasonable care, claims for use of ultrahazardous substances had to be dismissed); *National R.R. Passenger Corp. v. New York City Housing Auth.,* 819 F.Supp. 1271, 1279 (S.D.N.Y.1993) (dismissing nuisance claim based on ultrahazardous activity because plaintiffs implicitly acknowledged that, had defendants exercised due care in maintenance of structure coated with asbestos-containing material, no nuisance would have occurred); *DeFoe Corp. v. Semi–Alloys, Inc.,* 156 A.D.2d 634, 549 N.Y.S.2d 133 (2d Dep't 1989) (ultrahazardous-activity claim failed where plaintiff made no showing that defendant, by exercise of reasonable care, would have been unable to eliminate risk that caustic chemical would invade neighbor's property).

Furthermore, this claim, like all of plaintiffs' claims, suffers from the same defects concerning proof of damages discussed with respect to the negligence claim. Regardless of the theory of liability advanced by plaintiffs, they simply cannot establish damages with sufficient certainty.

Plaintiffs' nuisance and trespass claims thus fail for this reason as well. In addition, these claims attempt to impose a liability on Akzo that is expressly barred by the Agreement. As noted, the parties agreed that Akzo would not bear the risk of loss to the property by reason of any casualty in the event that it did not take title to the

property, and that Akzo would have no "obligation ... to repair or restore the Property or the Option Property or otherwise remedy such a loss." Agreement § 8.01. Plaintiffs have advanced no cogent reason why, having agreed to these terms, they should not now be bound by them.

 Furthermore, as explained with reference to the negligence claim, Akzo simply had no duty to return possession of the property in any particular condition. Although the element of duty relates to negligence rather than to nuisance or trespass, the point is that Akzo never had any legal obligation, or reason to believe that it had an obligation, to preserve the mine cavity in a particular condition. This is not like a traditional nuisance or trespass case in which a landowner uses his property in a way that interferes with his *neighbor*'s possession or enjoyment of his property. In general, a landowner cannot reasonably believe that he has a right to engage in an activity that is substantially certain to result in injury to his neighbor's property rights. In the case at bar, however, Akzo took possession of the mine with the correct understanding that it had the right to mine the salt through whatever methods it chose, regardless of the condition in which the mining chambers would be left (if, indeed, they were left at all). Once Akzo permanently ceased mining, possession would revert to the surface owners, but there was never any understanding that the surface owners' possessory rights would include a right to have the property (specifically the sub-surface) returned to them in any particular condition. Plaintiffs' nuisance and trespass claims, then, in effect seek to impose a duty on Akzo where none has ever existed.

 The complaint also asserts a claim for surface damage caused by the collapse. As noted, Akzo has stated that it is willing to compensate surface owners, including plaintiffs, for any legitimate, documented claim for surface damages.

No proof of any damage to surface lands owned by plaintiffs has been forthcoming, however. I therefore find that plaintiffs have failed to demonstrate the existence of a genuine issue of material fact on this claim,

and that this claim must be dismissed as well.

### CONCLUSION

Defendant's motion for summary judgment (Item # 4) is granted and the complaint is dismissed.

IT IS SO ORDERED.